**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

GROUNDTOAIR AVIATION SERVICES INC., d/b/a bioaqualife,

Plaintiff,

v.

KATRINA KESSLER, in her official capacity as Commissioner of the Minnesota Pollution Control Agency; and COMMERCIAL AND INDUSTRIAL FLEXIBLE FILM RECYCLING ORGANIZATION,

Defendants.

Case No.: 0:26-cv-4191

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. In Minnesota, the "Land of 10,000 Lakes," brutal winters make protective boat wrap indispensable. Each fall, the state's boaters, commercial marinas, and boatyards shield approximately 730,000 recreational watercraft from ice, snow, and freezing weather. To preserve these vessels until spring, marine operators encase them in durable shrink film. In a state with one of the nation's most active boating cultures, seasonal wrapping is not optional.

2. However, this annual statewide ritual creates a massive plastic crisis. Every spring, unwrapping Minnesota's boat fleet discards hundreds of tons of bulky, single-use plastic sheeting. Because conventional boat wrap is nonbiodegradable polyethylene, this waste won't decompose naturally.

Instead, it piles up in landfills for centuries or escapes into waterways, degrading into permanent microplastics that pollute the state's treasured lakes and rivers. Minnesota has a plastic waste problem, and conventional wrapping is compounding it.

3. Plaintiff Groundtoair Aviation Services Inc., doing business as bioaqualife, solved this crisis. Founded by entrepreneur Simon Milne in Rhode Island, bioaqualife developed bioWRAP: a patented, high-performance marine shrink film that replaces legacy plastics. It provides all the strength, durability, and weather protection boats require during harsh winters. Yet once discarded in a landfill, natural microbial activity completely biodegrades the film within three to five years, leaving behind zero toxic residues and zero persistent microplastics. BioWRAP doesn't contaminate mechanical recycling streams.

4. Rather than welcoming this innovation, Minnesota enacted a scheme that suppresses it. Under Minnesota's new Boat Wrap Product Stewardship Program ("Program"), the State regulates a favored product method rather than an environmental outcome. The law limits compliance only to mechanical recycling of conventional plastic wrap and treats biodegradable alternatives as mere landfill disposal. Minn. Stat. § 115A.1416 ("Statute").

5. Although bioWRAP is capable of being mechanically recycled, the Statute credits only mechanical recycling toward its mandatory performance

quotas and provides no alternative compliance pathway for landfill biodegradation. By classifying biodegradation as mere landfill disposal, the Program refuses to credit bioWRAP's distinct environmental benefits whenever boat wrap inevitably enters the solid-waste stream rather than a mechanical recycling facility.

6. Worse still, Minnesota surrendered regulatory control over this $18 million market to a private organization, Defendant Commercial and Industrial Flexible Film Recycling Organization ("CIFFRO"), created and run by executive leadership from incumbent plastic manufacturers. CIFFRO exercises sweeping authority to set mandatory producer dues, allocate volume quotas, select exclusive supply-chain partners, and define technical product standards.

7. With no active state supervision, these incumbents have erected a protectionist regulatory moat around their market to preserve demand for legacy plastics and stifle innovative market entrants like bioaqualife.

8. The Program and CIFFRO's regulatory capture muscle out greener technology. Under CIFFRO's state-approved plan, mandatory compliance dues would project to inflate bioaqualife's production and distribution costs from approximately $450 to $650 per standard roll of bioWRAP. Bioaqualife is legally barred from selling in Minnesota unless it

pays these dues to bankroll its rivals' mechanical recycling operations. Minn. Stat. § 115A.1416, subd. 3.

9. Adding insult to injury, the Statute imposes a sweeping gag rule prohibiting producers from transparently disclosing, itemizing, or passing through the Program's mandatory compliance fees to Minnesotans. Minn. Stat. § 115A.1416, subd. 14.

10. The scheme confronts bioaqualife with an unconstitutional dilemma: either pay these mandatory dues to subsidize the mechanical recycling operations of its direct rivals, or face a blanket exclusion from the Minnesota market altogether.

11. Rather than protecting the environment, Minnesota's scheme protects incumbent plastic manufacturers from competition, distorts local and interstate commerce, and deprives Minnesota marinas, boatyards, and consumers of an innovative, zero-microplastic solution.

12. Bioaqualife brings this action to vindicate its constitutional rights under the United States and Minnesota Constitutions. The government cannot surrender sovereign regulatory power to a private, unsupervised competitor cartel dictating market access. Nor may the State force an innovator to subsidize its commercial rivals, censor truthful speech to insulate entrenched incumbents from competition, or erect protectionist trade barriers to insulate incumbents from local and interstate competition.

## JURISDICTION AND VENUE

13. This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the Commerce Clause. This Court has subject-matter jurisdiction over Plaintiff's federal constitutional and statutory claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343(a)(3) (civil rights), and 15 U.S.C. §§ 15 and 26 (antitrust relief).

14. This Court has supplemental jurisdiction over Plaintiff's state constitutional claim under Article III, Section 1 of the Minnesota Constitution pursuant to 28 U.S.C. § 1367, because it arises from the same common nucleus of operative facts and forms part of the same case or controversy as the federal claims.

15. This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, 42 U.S.C. § 1983, and 15 U.S.C. § 26.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the District of Minnesota. In addition, Defendant Katrina Kessler maintains her official office within the District, Defendant CIFFRO conducts operations within the District, and the challenged statutory scheme directly impacts commerce in Minnesota.

## PARTIES

17. Plaintiff Groundtoair Aviation Services Inc., doing business as bioaqualife, is a Rhode Island corporation with its principal place of business in Jamestown, Rhode Island.

18. Bioaqualife manufactures bioWRAP, an innovative landfill-biodegradable marine shrink film. Bioaqualife seeks to sell its boat wrap to commercial and recreational customers in Minnesota, but the challenged statutory scheme effectively bars it from the market.

19. Defendant Katrina Kessler is the Commissioner of the Minnesota Pollution Control Agency ("MPCA"). In this role, Commissioner Kessler administers and enforces the Program under Minn. Stat. § 115A.1416. Commissioner Kessler's office approved CIFFRO's stewardship plan. She is sued in her official capacity.

20. Defendant Commercial and Industrial Flexible Film Recycling Organization is an entity incorporated in the District of Columbia with an operational address in Shakopee, Minnesota. CIFFRO operates as the state-approved stewardship organization under Minn. Stat. § 115A.1416 and exercises delegated regulatory authority over Minnesota's boat wrap market. CIFFRO is sued as an entity exercising state-delegated regulatory powers.

## FACTUAL ALLEGATIONS

**Winter Boat Wrapping in Minnesota and the Resulting Plastic Waste**

21. Minnesota is home to approximately 810,000 registered recreational boats and 700 to 800 commercial marinas, yacht clubs, and boatyards. Because of severe Upper Midwest winters, protective wrap is essential to shield vessels from the elements in the coldest months. MPCA estimates that approximately 730,000 recreational boats and marine vessels are shrink-wrapped each year. This seasonal winterization consumes between 240,000 and 290,000 rolls of film annually, generating an $18 million commercial market.

22. Nearly all conventional boat wrap used in Minnesota consists of single-use low-density polyethylene film. When boaters unwrap their vessels each spring, they discard hundreds of tons of bulky plastic sheeting.

23. Because mechanical recycling infrastructure for soiled marine wrap is prohibitively difficult, this nonbiodegradable waste often ends up in municipal landfills, where it sits for centuries or degrades into permanent microplastics that contaminate Minnesota waterways.

**Bioaqualife Develops an Innovative, Landfill-Biodegradable Solution**

24. Plaintiff Groundtoair Aviation Services Inc., doing business as bioaqualife, was founded in 2020 by entrepreneur Simon Milne in Jamestown, Rhode Island, and launched in 2023.

25. Bioaqualife was established to eliminate persistent single-use plastic waste across marine, transportation, and industrial wrapping sectors. After years of research, development, and investment, bioaqualife engineered bioWRAP, a patented shrink film designed to replace legacy polyethylene wrap with an environmentally friendly, biodegradable alternative.

26. Under rigorous third-party, industry-standard ASTM testing, bioWRAP matches or exceeds conventional shrink film in tensile strength, puncture resistance, ultraviolet protection, weldability, and heat-shrink speed. It requires no modifications to standard installation tools or commercial techniques. The material maintains an indefinite shelf life in storage because its biodegradation mechanism activates only after exposure to microbial activity in anaerobic landfill environments.

27. BioWRAP biodegrades into organic matter, water, and benign biogas, leaving zero microplastics, heavy metals, or toxic chemical residues in soil or groundwater.

28. Bioaqualife is ready, willing, and able to engage in interstate commerce and supply bioWRAP to commercial marinas, boatyards, and recreational boaters throughout Minnesota. The product delivers an effective, cost-competitive, and environmentally responsible alternative to legacy plastics. However, Minnesota's boat wrap product stewardship scheme

excludes bioWRAP from the market, preventing consumers from accessing this zero-microplastic innovation.

**Minnesota's Program Excludes Nonmechanical Alternatives and Nonmembers from the Market**

29. In 2024, the Minnesota Legislature enacted the Boat Wrap Product Stewardship Program, codified at Minn. Stat. § 115A.1416. Ostensibly intended to reduce plastic waste, the Statute establishes a mandatory regulatory regime across the statewide boat wrap industry. Any producer seeking to sell, distribute, or offer boat wrap in Minnesota must join and financially underwrite a state-approved product stewardship organization. Minn. Stat. § 115A.1416, subds. 2–3.

30. The Statute enforces compliance through a blanket market exclusion. No person may sell, distribute, or offer boat wrap in Minnesota unless the producer participates in an approved stewardship organization. A noncompliant producer is banished from the market, and retailers are prohibited from stocking its products. Minn. Stat. § 115A.1416, subd. 3(a).

31. The Statute imposes rigid statewide collection and recycling quotas on all participating producers. The Program must achieve a recycling rate of at least fifty percent of the total weight of boat wrap sold in Minnesota by 2030, and at least eighty percent by 2035. Minn. Stat. § 115A.1416, subd. 12(c).

32. The Statute regulates a favored processing method rather than an environmental outcome. It strictly defines "recycling" as "the process of transforming boat wrap through mechanical processes into a finished product for use or into a new material capable of being processed into a finished product." The definition explicitly excludes "altering the chemical structure of boat wrap." Minn. Stat. § 115A.1416, subd. 1(g).

33. Minnesota law categorically excludes natural biological decomposition from the definition of recycling. Under the Statute and broader state law, natural biodegradation is classified as landfill disposal. Even if all bioWRAP sold in Minnesota degraded completely into organic matter without leaving a single microplastic, that outcome would be wholly noncompliant with the challenged law's quotas. Minn. Stat. § 115A.1416, subd. 1(g)(1).

**Direct Commercial Competitors Control and Govern CIFFRO**

34. Instead of administering the Program through a neutral public agency, the Minnesota Legislature surrendered regulatory authority over the boat wrap market to a private entity, Defendant CIFFRO. Minn. Stat. § 115A.1416, subd. 2.

35. CIFFRO is governed exclusively by active market participants. Its three-member Board of Directors consists entirely of corporate executives from incumbent plastic businesses: Chairman Kelsey Pigneri, a senior executive of Poly-America, L.P.; Treasurer Brandon Lee, also of Poly-America, L.P.; and

Secretary Michael Stenberg, an executive of Dr. Shrink, Inc. These three individuals hold total governing authority over CIFFRO. Com. and Indus. Flexible Film Recycling Org., *Minnesota Boat Wrap Stewardship Plan (Revised)* 9 (Aug. 27, 2025), https://tinyurl.com/bdfchyyf ("*CIFFRO Stewardship Plan*").

36. Poly-America, L.P., and Dr. Shrink, Inc., are dominant producers and distributors of conventional, nonbiodegradable polyethylene boat wrap. These corporate incumbents possess direct commercial interests in preserving consumer demand for legacy plastic products.

37. Through CIFFRO, executives from these active market competitors wield delegated state power over the very market in which their commercial firms operate.

**CIFFRO Exercises Sweeping, Standardless Regulatory Authority**

38. The Statute grants CIFFRO standardless statutory authority to levy mandatory compliance dues upon all producers in the statewide market. The Statute contains no formula, fee caps, objective criteria, or legislative standards governing how fees must be computed or assessed.

39. CIFFRO exercises complete discretion to establish producer dues based entirely on its own internal "market share determinations." *CIFFRO Stewardship Plan* at 9, 14.

40. CIFFRO's standardless fee-setting power imposes prohibitive financial obligations on innovative entrants and interstate commerce. Based on CIFFRO's state-approved program plan, bioaqualife's assessed compliance dues would project to increase its production and distribution costs from approximately $450 per standard roll to $650 per roll of bioWRAP. This mandatory fee, extracted from an innovative out-of-state competitor, would then subsidize the local mechanical recycling industry.

41. The Statute also gives CIFFRO absolute discretion to design, operate, and control Minnesota's statewide boat wrap collection and transportation network. The Statute empowers CIFFRO to select and contract with specific collection sites, transporters, and processing facilities as exclusive "program partners," without any competitive bidding requirements or statutory standards beyond convenience for "urban and rural areas." Minn. Stat. § 115A.1416, subd. 5(3–5).

42. This unchecked "program partner" selection allows CIFFRO to control logistics and commercial access across the state. CIFFRO holds standardless power to approve favored collection facilities and exclude alternative service providers. This gives incumbent manufacturers complete authority to dictate statewide processing channels and deny nonaligned commercial enterprises logistical participation.

43. Under the Statute and its state-approved plan, CIFFRO exercises unilateral regulatory authority to define technical product standards for the entire marine wrap industry.

44. Specifically, CIFFRO possesses standardless discretion to define what materials qualify as "recycle-ready" boat wrap eligible for collection and processing within the statewide stewardship system, which is limited to conventional low-density polyethylene film. *CIFFRO Stewardship Plan* at 4, 33.

**The State of Minnesota Exercises No Active Supervision over CIFFRO**

45. Despite delegating binding regulatory authority over an $18 million commercial market, the State of Minnesota exercises no active, ongoing supervision over CIFFRO's operations.

46. MPCA conducts no independent audits of CIFFRO's fee calculations, enforces no fee caps, and maintains no administrative forum or procedure for aggrieved producers to challenge CIFFRO's dues, quotas, or partner selections.

47. The State's formal oversight is limited to approving CIFFRO's written stewardship plan once every five years or upon an amendment to the plan. Minn. Stat. § 115A.1416, subd. 7. MPCA exercises no day-to-day oversight, requires only an annual report from CIFFRO, and outsources

financial auditing to a private auditor chosen by CIFFRO. Minn. Stat. § 115A.1416, subd. 16.

**The Statute Inflicts Immediate Constitutional Harm on Bioaqualife**

48. The statutory scheme violates the First Amendment by conditioning bioaqualife's market access on compelled membership in, and financial subsidization of, CIFFRO. Conditioning lawful commercial sales on mandatory dues that bankroll the private operations and infrastructure of direct commercial rivals infringes bioaqualife's core First Amendment rights against compelled speech, compelled association, and compelled financial subsidies.

49. Minnesota Statute Section 115A.1416, Subdivision 14, specifically violates the First Amendment by restricting truthful speech. By prohibiting producers from communicating state-mandated stewardship compliance costs through separate invoices, surcharges, or line items, the Statute restricts truthful price disclosures without directly advancing any substantial governmental interest. This statutory gag prohibits accurate communications and deprives consumers of transparent market information.

50. The statutory scheme violates the Due Process Clause of the Fourteenth Amendment by delegating sovereign regulatory power to CIFFRO. Delegating binding fee-setting, logistics governance, and standard-making authority to private, economically self-interested market incumbents—without

intelligible legislative standards or active state supervision—violates core due process guarantees and deprives bioaqualife of its protected liberty and property interests in pursuing lawful commerce.

51. The statutory scheme violates the Commerce Clause of the United States Constitution. By conditioning market entry on participation in a competitor-run cartel, dramatically inflating production costs, and foreclosing out-of-state biodegradable alternatives, the scheme discriminates against interstate commerce in practical effect and imposes burdens on interstate trade that are clearly excessive in relation to any putative local benefits.

52. The statutory scheme violates Article III, Section 1 of the Minnesota Constitution. The Minnesota Legislature unconstitutionally surrendered legislative authority by delegating open-ended fee-setting and technical rulemaking power to a private entity. The Statute provides no clear policy, statutory limits, or procedural safeguards to restrain CIFFRO's arbitrary discretion.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Violation of the First Amendment: Compelled Speech, Association, and Financial Subsidy (U.S. Const. amend. I)

53. Plaintiff realleges and incorporates by reference all allegations contained in paragraphs 1–52.

54. The First Amendment protects the rights to free speech and association, which include the right to be free from compelled speech, compelled association, and compelled financial subsidies. The challenged scheme violates these core constitutional guarantees by conditioning market access on mandatory membership in, and financial contributions to, a private stewardship organization.

55. The scheme compels Plaintiff to financially subsidize and associate with an organization whose operations and expressive activity conflict with Plaintiff's core business model. Compulsory dues extracted from Plaintiff fund private operations, public messaging, and mechanical recycling infrastructure that promote conventional plastics and directly undermine Plaintiff's biodegradable product.

56. CIFFRO's state-approved plan lists an explicit public-advocacy goal of highlighting mechanical recycling as a sustainable alternative to landfilling. *CIFFRO Stewardship Plan* at 34. This compelled narrative directly

conflicts with bioaqualife's message and core business values, which center on natural landfill biodegradation.

57. Minnesota Statute Section 115A.1416, Subdivision 5(8), expressly mandates that the stewardship plan include a description of the promotion and outreach activities that will be undertaken to encourage participation in the boat wrap collection and recycling programs.

58. Minnesota Statute Section 115A.1416, Subdivision 10, mandates that the stewardship organization produce and distribute "educational materials." To fulfill this statutory requirement, CIFFRO runs the "Wrap Recycle Right" campaign. Bioaqualife's mandatory dues will thus fund messaging promoting mechanical recycling of conventional plastic film, which contradicts bioaqualife's own message about its product and forces Plaintiff to financially underwrite its commercial rivals' promotional speech.

59. But for the challenged Statute, bioaqualife would not be a member of CIFFRO and would not financially contribute to CIFFRO's operations or expressive activities.

60. This compelled association and subsidy are not a necessary incident of a valid legislative purpose, and the State's environmental goals could be achieved through significantly less restrictive means. The statutory scheme therefore violates Plaintiff's First Amendment rights.

## SECOND CAUSE OF ACTION

### Violation of the First Amendment: Commercial Speech Restriction (U.S. Const. amend. I)

61. Plaintiff realleges and incorporates by reference all allegations contained in paragraphs 1–60.

62. The First Amendment, applicable to the states through the Fourteenth Amendment, protects truthful commercial speech concerning lawful economic activity.

63. Plaintiff engages in lawful commerce and seeks to communicate truthful, accurate cost and price information by communicating state-mandated regulatory compliance fees on its commercial invoices, receipts, and customer contracts.

64. Minnesota Statute Section 115A.1416, Subdivision 14, unconstitutionally restricts Plaintiff's ability to transparently disclose, itemize, or pass through additional compliance costs to customers through or by displaying the Program's costs through separate fees, surcharges, or line items.

65. Subdivision 14 prohibits bioaqualife from stating a truthful fact on its invoices: the cost the Statute imposes. It singles out that subject matter for restriction and is therefore content-based.

66. Plaintiff would itemize the additional costs of the Program but for the restriction. But for Subdivision 14, bioaqualife would state on its invoices, as a separate line item labeled "Minnesota Boat Wrap Product Stewardship Fee," the amount attributable to each sale.

67. The line item would be truthful, factual, and nonmisleading. It would reflect the actual cost the Statute imposes on bioaqualife.

68. Bioaqualife's purposes in including the line item are to (a) inform customers of the cost the Statute imposes; (b) support its advocacy for reform of the Statute to recognize landfill-biodegradable alternatives, which it has pursued publicly, including through comments and supporting materials it submitted to MPCA on the draft plan; and (c) contribute to public debate in other states considering similar programs.

69. The restricted speech concerns the cost of a regulatory program and the Statute's merits. Bioaqualife seeks to use it to participate in public debate about the Statute.

70. Subdivision 14 does not set producers' prices. Its only effect is to restrict how a producer may communicate Program costs.

71. The restriction fails strict scrutiny. Shielding the Program from public awareness is not a compelling interest. Any interest in ensuring that boat owners are not charged when they deliver used wrap could be served by

prohibiting charges at collection or disposal, without barring truthful disclosure of a producer's cost.

72. In the alternative, the restriction fails *Central Hudson*. The speech concerns lawful activity and is not misleading. Concealing the source of a cost is not a substantial governmental interest. The restriction does not directly advance any interest in free collection. It is also more extensive than necessary.

73. This blanket ban restricts protected commercial speech. The State lacks a substantial interest in keeping consumers ignorant of state-mandated costs, and the prohibition does not directly advance any legitimate consumer protection objective.

## THIRD CAUSE OF ACTION

### Violation of the Due Process Clause of the Fourteenth Amendment (U.S. Const. amend. XIV)

74. Plaintiff realleges and incorporates by reference all allegations contained in paragraphs 1–73.

75. The Due Process Clause of the Fourteenth Amendment protects against the arbitrary deprivation of liberty and property and forbids the delegation of governmental regulatory power to private entities.

76. Plaintiff has a protected property and liberty interest in pursuing its lawful business and selling its products in Minnesota. The challenged

scheme unlawfully delegates binding regulatory authority over the boat wrap industry directly to Defendant CIFFRO, a private entity.

77. A state may not give private parties, especially competitors, the power to regulate a business's affairs. A private body may take part in regulation only if it functions subordinately to a public agency with authority and oversight.

78. This delegation is unconstitutional because CIFFRO is a self-interested private organization controlled by active market participants. CIFFRO's governing board is dominated by incumbent conventional plastic manufacturers whose commercial interests are directly adverse to Plaintiff.

79. Entrusting regulatory power over an unwilling competitor to private market incumbents deprives Plaintiff of due process.

80. The Statute impermissibly grants CIFFRO unilateral decision-making authority. CIFFRO exercises virtually unchecked power to set mandatory dues, select exclusive partners, and define technical compliance standards. Meanwhile, the State fails to exercise adequate oversight or subordination.

81. MPCA does not actively supervise CIFFRO's day-to-day activities, abdicating its regulatory role to a private entity.

82. The Statute prescribes no fee formula, cap, allocation rule, or standard of reasonableness for CIFFRO's fees. Subdivision 5 lists what a plan

must contain and does not require a fee methodology or schedule. The Commissioner reviews only whether the plan complies with Subdivision 5. Minn. Stat. § 115A.1416, subd. 7(a).

83. The Legislature knew how to limit fees when it wished to. It capped the administrative fee the stewardship organization pays the Commissioner at the agency's actual costs. Minn. Stat. § 115A.1416, subd. 13(a). It imposed no comparable limit on the fees CIFFRO charges producers.

84. CIFFRO establishes producer fee structures and assesses fees "based on market share determination," using sales data by product type and volume that members must report to CIFFRO. CIFFRO does not publish or otherwise disclose the methodology, inputs, or weighting to Plaintiff.

85. In response to public comments, MPCA stated that the fee structure is determined by the stewardship organization that represents the producers. Minnesota Pollution Control Agency, Agency Responses to Public Comments Received on the Draft ABOat Wrap Stewardship Plan Submitted by CIFFRO on March 3, 2025, at 21, available at https://www.pca.state.mn.us/sites/default/files/w-ps1-06f.pdf.

86. CIFFRO's board can see rivals' producer-level sales data and sets the formula that divides program costs among rivals.

87. CIFFRO alone decides which collectors, transporters, and recyclers become program partners, and it writes the standards, SOPs, and

best-practice rules that determine which wrap counts as "recycle-ready" and which partners may participate or be terminated. The Commissioner approved the plan's general criteria on August 29, 2025. Individual partner decisions and later changes to standards are not submitted for review.

88. Neither the Statute nor MPCA's process provides a hearing, notice-and-comment, or judicial review for challenges to CIFFRO's fees, participation-agreement terms, or compliance determinations. Public comment is available for stewardship plans and plan amendments only. Minn. Stat. § 115A.1416, subd. 8.

89. The scheme lacks adequate procedural safeguards, administrative hearings, or judicial review to protect businesses from the arbitrary exercise of delegated power. This uncontrolled private delegation violates due process.

90. The Statute lacks adequate safeguards: no notice of the rules CIFFRO adopts, no participation in fee decisions, no hearing, and no judicial review. The Legislature's immunization of CIFFRO's conduct from state antitrust law further insulates it. Minn. Stat. § 115A.1416, subd. 9.

91. The Commissioner's approval of the plan is a one-time review within the five-year cycle of whether it contains the elements listed in Subdivision 5. It does not reach fees or later implementation decisions, and it is no substitute for authority and surveillance over the powers described above.

92. Plaintiff has suffered and continues to suffer concrete injuries fairly traceable to this unconstitutional delegation. Under CIFFRO's vast delegated authority and the State's enforcement of the scheme, Plaintiff is effectively excluded from the Minnesota market. Plaintiff is entitled to declaratory and injunctive relief.

## FOURTH CAUSE OF ACTION

### Violation of the Commerce Clause
### (U.S. Const. art. I, § 8, cl. 3)

93. Plaintiff realleges and incorporates by reference all allegations contained in paragraphs 1–92.

94. The Commerce Clause of the United States Constitution prohibits states from discriminating against or unjustifiably burdening interstate commerce.

95. Under the dormant Commerce Clause doctrine, state laws that discriminate in practical effect or purpose face strict scrutiny, while nondiscriminatory enactments violate the Constitution if their burdens on interstate commerce are clearly excessive in relation to putative local benefits.

96. The challenged scheme and CIFFRO's stewardship plan discriminate against interstate commerce in practical effect. The statutory regime protects incumbent manufacturers and local recycling infrastructure while banishing out-of-state producers, including Rhode Island-based

bioaqualife, from Minnesota's $18 million market unless they surrender commercial independence to a competitor-controlled organization.

97. The Program also exports its costs beyond Minnesota's borders. By forbidding producers from recovering Program costs from Minnesota purchasers, Subdivision 14 forces producers to absorb those costs into prices charged to customers in other states. That burden falls on commerce occurring wholly outside Minnesota and serves no legitimate local purpose.

98. By conditioning entry into the Minnesota market on membership dues set by a private organization, the Program places a financial barrier around the State. The scheme also imposes burdens on interstate commerce that are clearly excessive in relation to any putative local benefits. It directly impedes interstate commerce by foreclosing out-of-state producers from the market, inflating bioaqualife's per-roll costs from $450 to $650, and compelling out-of-state businesses to financially underwrite local commercial competitors.

99. These burdens cannot be justified by any legitimate local public benefit. The State's putative environmental goals are not credibly advanced by a mandate that entrenches conventional nonbiodegradable plastics, exacerbates microplastic pollution, and excludes eco-friendly alternatives that could easily be accommodated through less burdensome means.

100. By penalizing out-of-state innovation, insulating incumbent plastic interests from interstate competition, and imposing burdens on

interstate commerce that are clearly excessive in relation to any putative local benefit, Defendants have deprived Plaintiff of rights secured by the Commerce Clause.

## FIFTH CAUSE OF ACTION

### Violation of the Minnesota Constitution (Minn. Const. art. III, § 1)

101. Plaintiff realleges and incorporates by reference all allegations contained in paragraphs 1–100.

102. Article III, Section 1 of the Minnesota Constitution prohibits the Legislature from delegating purely legislative power to any other body, person, or private entity. The Statute violates this separation of powers by delegating core legislative power over Minnesota's boat wrap market to CIFFRO, a private entity.

103. The Statute fails to provide a reasonably clear policy or standard of action to guide and limit CIFFRO's regulatory authority. Instead, the Legislature enacted an open-ended regulation that grants a private, self-interested party the arbitrary power to make the law operative on its own terms.

104. The Statute further unconstitutionally delegates open-ended fee-setting authority to CIFFRO without an express statutory limitation. CIFFRO

possesses standardless discretion to levy mandatory dues and allocate financial burdens to producers across its own market.

105. The Statute lacks adequate procedural safeguards, administrative hearings, or judicial review to protect businesses from the arbitrary exercise of delegated power. This uncontrolled private delegation violates Article III, Section 1 of the Minnesota Constitution.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

1. A declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure that Minn. Stat. § 115A.1416 and CIFFRO's state-approved stewardship plan, facially and as applied to Plaintiff, violate the Due Process Clause of the Fourteenth Amendment, the First Amendment, the Commerce Clause, and Article III, Section 1 of the Minnesota Constitution;

2. A preliminary and permanent injunction enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them from implementing or enforcing Minn. Stat. § 115A.1416 and the stewardship plan;

3. An award of nominal damages in the amount of $1.00;

4. An award of reasonable attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988 and other applicable law; and

5. Such other and further relief as the Court deems just, necessary, or proper.

Dated: September 29, 2026.

Respectfully submitted,

/s/ *Brandon Beyer*
BRANDON BEYER
Minn. Bar No. 0403249
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: 202-888-6881
BBeyer@pacificlegal.org

JOSHUA POLK*
Cal. Bar No. 329205
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: 916-419-7111
JPolk@pacificlegal.org

* *Pro Hac Vice forthcoming*